## In re JOHNSON.
### No. 2224.

United States District Court
N. D. Texas, Fort Worth Division.
March 27, 1953.

Brantley Pringle, Fort Worth, Tex., for creditor Parker.

Mayer, Tuchin & Mehl, Fort Worth, Tex., for bankrupt Johnson.

DOOLEY, District Judge.

Peyton Johnson was duly adjudged a bankrupt on petition filed against him in this Court on December 16, 1950. James E. Parker, a creditor, objected to the discharge of said bankrupt, and finally relied on four of his specified grounds of objections, but only two thereof, together with the relevant provision of the Bankruptcy Law,[1] will be particularly noted.[2] The referee refused the objections to discharge, and entered an order of discharge May 16, 1951. The objecting creditor, Parker, on May 26, 1951 filed a petition for review, and the errors therein assigned dealing with the foregoing two grounds of objections are quoted in the margin.[3] The referee later filed findings of fact and conclusions of law and the parts thereof now pertinent are appended.[4] The referee's

1. Sec. 14, sub. c(3). "The court shall grant the discharge unless satisfied that the bankrupt has * * * (3) obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing or causing to be made or published in any manner whatsoever, a materially false statement in writing respecting his financial condition; * * * Provided, That if, upon the hearing of an objection to a discharge, the objector shall show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed any of the acts which, under this subdivision [c], would prevent his discharge in bankruptcy, then the burden of proving that he has not committed any of such acts shall be upon the bankrupt." 11 U.S.C.A. § 32, sub. c (3).

2. "On or about September 26, 1950, Peyton Johnson, the bankrupt, obtained property, to wit, seven hundred (700) face bricks, from the Acme Brick Company, on credit, by making and publishing on December 21, 1949, a materially false statement in writing respecting his financial condition, which materially false statement was that his total liabilities were $3,000.00, whereas in truth and in fact the same were $18,000.00.

"On or about September 28, 1950, Peyton Johnson, the bankrupt, obtained property, to wit, one hundred thirty (130) face bricks, from Acme Brick Company, on credit," and continuing in the language of above specification.

3. "The referee erred in respect to said Order, in that the overwhelming preponderance of the credible testimony showed that on or about September 26, 1950, Peyton Johnson, the bankrupt, obtained property, to wit, seven hundred (700) face bricks, from the Acme Brick Company, on credit, by making and publishing on December 21, 1949, a materially false financial statement in writing, which materially false statement was that his total liabilities were $3,000.00, whereas, in truth and in fact the same were $18,000.00.

"The referee erred in respect to said order, in that the overwhelming preponderance of the credible evidence showed that on or about September 28, 1950, Peyton Johnson, the bankrupt, obtained property, to wit, one hundred thirty (130) face bricks, from Acme Brick Company, on credit", and continuing substantially in the language of above assignment.

"The referee erred in respect to said order, in that the referee did not charge the bankrupt, Johnson, with his judicial admissions, duly read into evidence, that he, the bankrupt, does not know whether the Acme Brick Company relied in extending credit upon his financial statement made to Dun and Bradstreet on December 21, 1949."

4. "1. Peyton Johnson, the bankrupt herein, on or about December 10, 1949, executed and delivered an unsecured, promissory note to objecting creditor, James E. Parker, for $15,000.00.

"2. The note evidenced a loan made by Parker to Johnson at the time of its execution and bore 2% interest. * * *

"4. On or about December 21, 1949, the bankrupt made a written financial statement to Dun & Bradstreet. He made such statement voluntarily by furnishing the information verbally to a representative of Dun & Bradstreet, who, in turn, filled in the blanks on the printed form, which form was thereafter signed by the bankrupt.

"5. The said financial statement was incorrect, in that it failed to list the $15,000.00 note owing to Parker. This omission had been concurred in, and, in fact, suggested by Parker, and the purpose, both the bankrupt's and Parker's, was to make a financial statement that would look good.

"6. A few weeks later and before July 29, 1950, the bankrupt at a further conference with a representative of Dun &

theory on the particular point now being re-examined was further stated by him in a written opinion.[5]

■ ·In December 1949 Peyton Johnson was at the point of going into the business of constructing prefabricated houses in Fort Worth, Texas, and on December 10, 1949 he borrowed $15,000 from Parker for capital in his said business. He went to the office of Dun & Bradstreet, Inc. about December 21, 1949, to make contact with said mercantile agency in the interest of his new business, and while there related the information used by a representative in filling out a financial statement on the regular form of said agency, and personally signed it. The top line of the sheet he signed had this entry: "Statement Made. To Dun & Bradstreet, Inc. For Use Of Subscribers As A Basis For Business Deci-

Bradstreet made a full disclosure as to the $15,000.00 indebtedness.

"7. The bankrupt in said statement of December 21, 1949, had omitted certain assets, mainly exempt assets, so that the net worth shown on the statement was approximately correct.

"8. On July 29, 1950, Acme Brick Company, a subscriber, received information from Dun & Bradstreet, based on the statement of December 21, 1949. Prior to receiving such information Acme Brick Company had extended credit to the bankrupt in the sum of $330.00. After receiving the statement, it made two further extensions of credit, to-wit, on September 26, 1950, of $28.07, and on September 28, 1950, of $5.33. All three accounts were paid in full and Acme Brick Company is not here objecting to the discharge. Acme Brick Company did not rely on the statement in extending the credit on September 26th and September 28th. The bankrupt did not obtain such credit on the financial statement.

"9. On or about March 1, 1950, the bankrupt made a financial statement to the First National Bank of Fort Worth, in which the $15,000.00 was likewise omitted. * * *

"11. That within the meaning of Section 14c(3) of the Bankruptcy Act, the bankrupt did not, as charged, obtain credit from Acme Brick Company on a materially false statement in writing respecting his financial condition.

"13. That the Dun & Bradstreet statement of December 21, 1949, was not, under the circumstances in this case and within the meaning of Section 14c(3), materially false."

5. He said that as to the objections "wherein it is charged that Acme Brick Company, who is not a creditor, and is not objecting to the discharge, relied on the financial statement, dated December 21, 1949, furnished to Dun & Bradstreet by the bankrupt, proof of such reliance failed. Witness, W. T. Johnson, (not shown to be related to the bankrupt)

credit manager of the Acme Brick Company, testified that in extending credit to the bankrupt on September 26, 1950, and September 28, 1950, of $28.07 and $5.33 on the respective dates, his company relied 'to a large extent' on the statement. Other pertinent facts, however, show that the witness was mistaken and that if there was any reliance whatever, it was negligible. The other pertinent facts referred to include:

"(1) Before receiving the statement Acme Brick Company extended credit to the bankrupt in the sum of $330.00, and

"(2) Acme Brick Company as a materialman could always protect itself by perfecting a lien on the real estate of the bankrupt, to and for the improvement of which all such material was furnished, with which right Witness Johnson testified that he and the Acme Brick Company were at all times familiar. All the accounts of Acme Brick Company were paid in full and said company is not objecting to the discharge.

*     *     *     *     *     *

"Now on the question of material falsity:

"The statement failed to list a note for $15,000.00 which the bankrupt owed ·to objector Parker. He, likewise, failed to list all of his assets (mainly exempt) with the result that the net worth shown on the statement was correct. There are cases which hold that under such state of facts there is no material falsity. There are, also, cases which hold that failure to list an item in a printed form of assets and liabilities is not the 'making' or 'publishing' of a statement, and that the allegedly false statement must be made positively and not negatively. With this latter group of cases I can not agree. I think a deliberate failure to list an item of indebtedness is the equivalent of saying that you do not owe it. However, in this case, and, under the facts stated above, I find that the statements made to Dun & Bradstreet and to the Bank were not materially false."

sions." The statement showed total assets of $22,600, including $14,000 cash, evidently the money obtained from Parker, and showed total liabilities of only $3,000, thus reflecting a net worth of $19,600. His debt to Parker was omitted from the statement and he knew it.[6] In extenuation he makes two points, first that Parker told him to keep the loan confidential, and second that some undeclared assets he owned ought to offset the discrepancy of understated liabilities in his financial statement. The first excuse rests on Johnson's testimony that Parker said some of his relatives might try to have him declared an incompetent if they found out about the loan, and that the transaction should be kept confidential. Obviously the conversation did not have in mind the subject of a mercantile agency financial statement. Parker simply wanted to guard against his relatives getting any word that he had made such an unsecured loan. In other words, he wanted to remain anonymous in the transaction. That purpose would not have been violated if Johnson had included this liability in his financial statement. The financial statement simply called for amounts and not the identity of any creditor. The liability could have been included without defeating the personal privacy desired by the lender. Manifestly this is a lame excuse for the falsification in the financial statement. The other contention that Johnson failed to include certain assets in said statement is raised only by vague generalizations in his testimony.[7] He does not enumerate any specific omitted assets nor give any appraisal of property values. When the intimation of missing assets was made at the hearing before the referee counsel for bankrupt did not follow through to develop any details or other tangible facts on the subject. The only thing definite about such alleged assets is that the referee finds same consisted mainly of exempt property. The whole thing is too indefinite for any practical utility. Moreover any such omitted assets, if satisfactorily proven, would not neutralize the materiality of the falsification in the financial statement. In the first place exempt property would make no weighty difference at best, and in any event undisclosed assets, whether exempt or non-exempt, if taken into account nunc pro tunc, would certainly upset the proportion between assets and liabilities as actually listed in the financial statement. The statement as written and signed reflected assets of over $22,000 against liabilities of only $3,000 or a ratio of better than 7 to 1, while if the liabilities be increased by $15,000 and the assets increased by a like amount, then the statement would reflect assets of about $37,000 against liabilities of $18,000 which would make a ratio of about 2 to 1. The fallacy in thinking that a false financial statement can be defended in such a way by attempting to offset some additional assets against the admitted omission of a relatively large liability was pointed out long ago by Judge Learned Hand,[8] and the ruling has been confirmed by other courts.[9] The bankrupt Johnson also says that after he made and signed the financial statement of December 21, 1949, being so indefinite as to the time that he first said it was about the middle of 1950 and last said it was only several

6. Some of his testimony is covered in the following questions and answers:
   "Q. Mr. Johnson, at the time that you made this statement to Dun & Bradstreet you knew that you owed Mr. Parker $15,-000 because of that note, did you not? A. I did.
   "Q. You intended not to disclose the existence of that $15,000 debt, is that correct? A. That is correct."

7. "Q. Isn't it true that you didn't list the $15,000 to Mr. Parker? A. It is true. And in offsetting it I didn't list my assets completely."

\* \* \* \* \* \*
   "Q. What assets did you own that are not listed in the schedule of assets shown on the Dun & Bradstreet statement headed 'Financial Information?' A. A wide variety. A man thirty-five or thirty-six years old amasses a considerable number of assets, as a result of my marriage with my wife."

8. In re Maaget, D.C., 245 F. 804.

9. In re Keller, 2 Cir., 86 F.2d 90; In re Reed, D.C., 256 F. 412.

weeks after the statement was signed, he was in company with a reporter of Dun & Bradstreet, Inc. at a cafe and told him all about his deal with Parker, but he did not testify that his purpose thereby was to have said statement amended by an increase in his liabilities or that he wanted to make a new and corrected statement, nor even that he explained the transaction in a way recognizing an outright and binding obligation to Parker, and the significance of this last comment is emphasized by his tendency in testimony to question the fact of a positive liability.[10] In any event the record in the files of the mercantile agency was not changed and it still acted on the faith of the same signed statement of December 21, 1949. It is most unlikely that the bankrupt, if he had any such talk in the cafe, meant to have any change made in his signed statement, since on March 1, 1950, he made an application to the First National Bank in Fort Worth for a loan of $18,000 and pursuant thereto personally filled out on his own typewriter the data called for in the bank's form of financial statement and opposite the entry "Notes owed to others", he wrote in "None". In other words at this time he persisted in the same concealment of his debt to Parker that he did in the statement previously signed at the office of Dun & Bradstreet, Inc. The only rational conclusion is that he had not intended to rectify such concealment in his said first financial statement. The bank decided against making the loan, but that does not affect the tell-tale weight of the bankrupt's act from the standpoint above mentioned.

The dealings between the bankrupt and the Acme Brick Company (Acme) will now be noticed. W. T. Johnson, treasurer and credit manager of the Acme, testified as shown below.[11] The bankrupt in 1950 was

10. "Q. Under liabilities on those sheets it shows you had current total liabilities of $3,000. Was that a correct statement of your total current liabilities at that time? A. It was correct.

"Q. That item did not include the $15,-000 due Mr. Parker, did it? A. Under the terms of the agreement with Mr. Parker, Mr. Parker used the word rather loosely I realize now. Several times Mr. Parker made the broad statement that money didn't mean anything to him. At that time there was some doubt in my mind as to whether Mr. Parker expected to get his money back."

* * * * *

"Q. Did it include this item of $15,000 in evidence? A. If it was a debt at that time, it didn't include it."

11. The following testimony of the credit manager covers parts of both the direct and cross-examination of the witness:

"Q. Do you know whether or not the Acme has engaged in any credit transaction with Mr. Peyton Johnson, doing business as Johnson Construction Company? A. Yes, sir, we have.

"Q. Are you a subscriber to Dun & Bradstreet? A. Yes.

"Q. Did you make inquiry of Dun & Bradstreet as to Mr. Johnson's financial responsibility? A. We did.

"Q. Did you receive a reply back from Dun & Bradstreet? A. We did."

* * * * *

"Q. I asked you the date. Did you tell me the date? A. July 29, 1950.

"Q. Thereafter did you extend credit to Mr. Peyton Johnson, doing business as Johnson Construction Company? A. About that time."

* * * * *

"Q. Did you rely upon that statement? A. I did to a large extent; yes, sir.

"Q. Did you rely upon it in making sales to Peyton Johnson in September? A. To a large extent."

* * * * *

"Q. Mr. Johnson, if I understand you correctly, you show that you received this Dun & Bradstreet statement on July 29, 1950, is that correct? A. That is correct.

"Q. And you testified also that on July 26th, some three days prior to receipt of this statement, Mr. Johnson incurred a debit balance with you of $330, is that correct, sir? A. That is correct.

"Q. Then, in making that initial sale to him on credit of $330, it is fairly obvious, is it not, that you didn't rely on this statement to issue $330 in credit? A. No, it is not obvious, because we had the information before we had the report. We generally get that by telephone in advance of getting the report, sometimes several days."

* * * * *

"Q. Now, did you receive any other reports from Dun & Bradstreet on Mr. Johnson? A. We received later reports."

* * * * *

a newcomer in business and it is a fair inference he had never bought anything from said company before on credit. His first purchase of bricks was in the amount of $330 on July 26, 1950. Later on September 26 and September 28, 1950 he made two more similar purchases in the sums of $28.70 and $5.33 respectively. His account for the first purchase was still unpaid at the time of the last two purchases, but all of the account was paid before the filing of this bankruptcy. The credit manager testified more than once that in making these credit sales to the buyer Johnson he relied to a large extent on the financial statement the latter had delivered to Dun & Bradstreet, Inc. The referee despite those assertions found that the credit manager was mistaken and that he did not rely on such financial statement. The rule is that the fact findings of the referee are to be accepted unless clearly erroneous, and that proposition has particular force as to credibility and in the field of conflicting testimony. There is no conflicting testimony to deal with in this instance and the referee does not challenge the credibility of the witness. He only says the witness was mistaken. The reasons given are (1) that the first bill of $330 was sold before the company received the written report from Dun & Bradstreet, Inc., and (2) the company could always protect itself by perfecting a materialman's lien, as was known to said credit manager. It is true that the first sale was made before receipt of the written agency report, but that is modified by the further fact that the credit manager said that his regular practice in opening an account was to make a preliminary check by telephone with Dun & Bradstreet, Inc., and he was sure in his own mind that was done in this instance. His conviction is inherently probable since apparently the buyer was a stranger to him as a credit customer at that time and is also strongly corroborated by the circumstance that the first sale was made July 26 and the written report from Dun & Bradstreet, Inc. was received July 29. This certainly fits the pattern of a telephone inquiry from a subscriber followed in regular course by a written report of the mercantile agency mailed a few days later. Of course if the first bill of $330 had been paid promptly and then afterwards the two smaller bills had been sold then there might be some plausibility in saying that the company had already tested this buyer's credit responsibility and that was good enough to induce the two later sales, but the actual picture of the account mounting until all three sales were unpaid in the aggregate sum of about $365, is the equivalent of a single sale in that sum from a credit standpoint. It is hardly reasonable that the credit manager would have approved the accumulation of such indebtedness without substantial reliance on the information from Dun & Bradstreet. He says he did so rely and

"Q. Then, just by way of simply, if I understand you correctly, you didn't rely on this report when extending $330 credit to Peyton Johnson, is that correct? A. Not on this particular report, but I relied on information I received from Dun & Bradstreet over the telephone before this report was sent.

"Q. Are you now testifying that you did call Dun & Bradstreet? A. I am pretty sure I did. I don't recall the conversation; we have several hundred a day."

\* \* \* \* \* \*

"Q. It is possible you may not have called? A. It is possible but not probable."

\* \* \* \* \* \*

"Q. Then the information that you say you may have received from Dun & Bradstreet came to you by telephone and not from a statement furnished to you by Dun & Bradstreet to you in writing, is that correct, sir? A. That is correct.

"Q. A complete statement that Mr. Johnson may have given to Dun & Bradstreet was not presented to you for credit purposes at the time you approved the credit to Mr. Johnson, is that correct? A. I don't know what you mean by complete. I think I had the information, parts of it or the information.

"Q. You are positive? A. I am not positive of anything except taxation."

\* \* \* \* \* \*

"Q. Mr. Johnson, in making these sales on credit to Mr. Peyton Johnson or Johnson Construction Company on September 26th and September 28th, did you rely upon the financial information given by Dun & Bradstreet to you? A. To a large extent, yes."

he was a disinterested witness. Acme has no stake at all in this bankruptcy, and has nothing to gain whether a discharge is granted or refused to this bankrupt. The suggestion that the company could have perfected a materialman's lien is quite inconclusive. For one thing there is no pretense that the company ever undertook to fix such a lien nor any proof that such a right in the abstract was any factor at all in selling on credit to the customer. Even if such a contingency was any factor that would not shake the credit manager's testimony that he relied largely on the financial statement made by the bankrupt. The law is that a partial reliance on a false financial statement is enough to defeat discharge of the bankrupt.[12] In fact had Acme demanded and received direct security at the outset it still might have relied also on said financial statement in the sense of the bankruptcy law.[13] Another important element in the present question is the burden of proof. The bankrupt knowingly made a materially false financial statement to Dun & Bradstreet, Inc. It follows that, not the objecting creditor, but the bankrupt, had the burden of proof and thus needed to negative reliance of the Acme on said false financial statement.[14] The referee clearly erred in ruling contrary to the plain, positive and probable testimony of the credit manager and at odds with the burden of proof.

■ Several other incidental questions will be mentioned next. The fact that the Acme was paid before the opening of bankruptcy proceedings, so that it is not even a creditor, much less an objecting creditor, is quite immaterial.[15] The present objecting creditor has full standing in law to contest the discharge of this bankrupt, although the ground of objection relates to the false financial statement received by a former creditor and one not a party in the present bankruptcy.[16] Indeed if the policy of the law were otherwise it would invite mischievous consequences. The natural impulse of a hard pressed debtor, knowing he had resorted to false financial statements, would be to leave no stone unturned in trying to pay off creditors victimized by such financial statements, as a hedge and in the hopes of forestalling potential opposition to discharge in event of bankruptcy. In other words, there would be a great urge to attempt preferential payments. This very case is a good object lesson. About the last of October 1950 the bankrupt sold some property for over $9,000 and forthwith went about hastily paying a number of favored creditors, including Acme, but paid no part of his debt to the present objecting creditor. It would be quite a loophole in the bankruptcy law if, under such circumstances, this creditor could not maintain opposition to a discharge.

■ The fact that the mercantile agency was the conduit does not detract from the bankrupt's responsibility for the financial statement, nor the impediment thereof to his discharge.[17]

■■ The referee came to the conclusion that Parker was culpably implicated in the false financial statement Johnson filed with Dun & Bradstreet, Inc. This is not a tenable position as already pointed out herein. The only testimony in the record even smacking of such a thing is a single answer of the bankrupt that "Parker knew about this statement" to Dun & Bradstreet, Inc. This is a sample of the many loose

12. In re Ernst, 2 Cir., 107 F.2d 760; Banks v. Siegel, 4 Cir., 181 F.2d 309; Yates v. Boteler, 9 Cir., 163 F.2d 953.

13. Banks v. Siegel, supra.

14. Morris Plan Industrial Bank v. Parker, 79 U.S.App.D.C. 164, 143 F.2d 665;' In re Berberich, 7 Cir., 190 F.2d 53; In re Haggerty, 2 Cir., 165 F.2d 977; Margolin v. Moskowitz, 2 Cir., 157 F.2d 872; Federal Provision Co. v. Ershowsky, 2 Cir., 94 F.2d 574.

15. In re Ernst, supra; In re Haggerty, supra; In re Arky, 2 Cir., 138 F.2d 669.

16. Sadler v. Hirshberg Bros., 6 Cir., 23 F.2d 245; Cunningham v. Elco Distributors, Inc., 6 Cir., 189 F.2d 87, 25 A.L.R. 2d 1008; Yates v. Boteler, supra; In re Sheridan, D.C., 34 F.Supp. 286; In re Eastham, D.C., 51 F.2d 287.

17. Yates v. Boteler, supra; Weinberg v. American Shoe Co., 5 Cir., 15 F.2d 557.

and indefinite statements in the bankrupt's testimony. If it means that Parker merely knew the bankrupt made a statement to said agency that would amount to nothing, as to say he had knowledge of the statement is not saying he knew it was a false statement, and also the first he knew of it could as well have been after the statement had been executed. The bankrupt does not say that Parker ever specifically told him to falsify such statement or that Parker ever saw the statement and it is quite clear Parker was not present when the same was made and signed. It will not do to deploy such vague and equivocal testimony into the particular meaning that the false detail of the statement was Parker's handiwork. Even if Parker in fact had been actively implicated in said financial statement, it does not follow that would defeat this opposition to the bankrupt's discharge.[18]

The referee mentions that Parker in making the loan to Johnson worked in an incidental promise by Johnson to pay 20 per cent of the net profits of his business during the first year to a woman friend of Parker, and the query is raised that all of the circumstances of the transaction may point to a joint adventure between Parker and Johnson. This seems a far-fetched theory. The question hardly calls for any more examination as it is undisputed that Johnson, without ever having made or paid any profits to the other party, bought back for a small money consideration his letter evidencing said profit sharing agreement, and this was done September 20, 1950, well before the date of bankruptcy, and even shortly before the two last purchases of bricks from Acme.

The two grounds of objection to discharge herein discussed are sustained, and the other two grounds, not necessary to set out in detail, are overruled, as was done by the referee, and the order of the referee granting a discharge is reversed and instead an order will be entered denying such discharge.

18.  Cunningham v. Elco Distributors, Inc., supra.